## THE SIDNEY.[1]

## THE WILLIAM WORDEN.[1]

PROVIDENCE WASHINGTON INS. CO. *v.* THE SIDNEY, and her Consort, THE WILLIAM WORDEN.[1]

(*District Court, S. D. New York.* January 30, 1885.)

1. INSURANCE—SUBROGATION—NEGLIGENCE—PAROL EVIDENCE.

A cargo of wheat, from the west to New York, was laden at Buffalo, through M. & Co., forwarders, on the canal-boat W., and insured by them as part of the price of freight agreed upon. At the beginning of the season, M. & Co. had taken out an "open policy" with the libelants "for whom it may concern," which required that each transaction under it should be entered in an accompanying policy book, or indorsed on the policy, stating the persons on whose account it was effected. A certificate payable to order was issued on this transaction to M. & Co., in their names, without the words "on account of whom it may concern," or equivalent words, and their names only were entered in the policy book. M. & Co. delivered the certificate, indorsed by them, along with the bill of lading signed by the captain of the W., which they also signed, to the agents of the owners, paying some $200 prior charges, and also making further advances to the captain for the trip. They took from the master a separate bill of lading in which they were described as shippers, and in which the boat and cargo were consigned to their own New York agents, for their own protection. While the Worden was coming down the Hudson, in charge of the Sidney, both vessels belonging to the same owner, a steam-flue on the Sidney burst; the vessels drifted and stranded upon an island and the W.'s cargo was lost. The owners abandoned to the insurers, who paid them as for a total loss, and, claiming to be subrogated to the rights of the owners against the carriers, filed a libel against the S. and W. to recover for the loss. *Held*, that the consignees, the carrier, and M. & Co. had each an insurable interest in the cargo to its whole value; that a policy "for whom it may concern" assures all persons, having an insurable interest, that are intended to be covered by it, whether known to the insurers or not; that the conditions of the policy and the certificate in this case limited the general words of the policy, and that only M. & Co., the persons named, were "the assured" under the policy; and that the persons and interests assured could not be enlarged by parol evidence, and that the libelants, on paying the owners, as indorsees of the certificate, were subrogated to the rights of M. & Co. only.

2. SAME—CARRIERS—AGENCY—BENEFIT OF INSURANCE.

M. & Co., in procuring freight and making advances on account of the carrier, acted as his agents. The insurance effected by M. & Co. was intended for the benefit of the shipper, the carrier, and for themselves, and was effected upon the request and authority of both, there being no express reference to subrogation in the policy. *Held*, that such subrogation is a mere equity, depending on the actual relation of the various parties to one another, and is therefore subordinate to the equitable rights existing between a principal and his agent, who effects the insurance for the benefit of both; that the payment by the insurers in this case to the owners, was, in effect, the same as a payment to M. &

[1] Reported by R. D. & Edward Benedict, Esqs., of the New York bar

Co., and by the latter to the owners; that on payment of the insurance to M. & Co., the carrier, as principal, could have compelled a payment by M. & Co., as his agents, to the owners, in discharge of their joint liability under the bill of lading; and therefore that no equitable right of subrogation existed through M. & Co., against the carrier, in favor of the insurers.

3. SAME—VOLUNTARY SETTLEMENT—NEGLIGENCE—BURDEN OF PROOF—PRIVIES.

The policy excepted loss through "want of ordinary care and skill in navigating said boats." *Held*, that if the case were one of doubt whether the loss happened by negligence or not, and if the carrier were not equitably entitled to the benefit of the policy, the insurers might have paid the owners of the goods with an assignment of all claims for damages to themselves, and then have prosecuted the carriers for indemnity, and recovered on proof that the loss was in fact due to negligence of the carrier; but that as the company has once paid the owner upon a voluntary settlement, as upon a loss under the policy, and the carrier being equitably entitled to the benefit of the policy, he is entitled to the benefit of the settlement made under it; and that such a settlement cannot be set aside except for duress, fraud, or mistake, and that the burden of proof, in an action to recover back the money from the carrier, was upon the libelants to show the fraud or mistake, and also that the loss was within the exception of the policy, and not a valid claim.

4. SAME—LOSS NOT COVERED BY POLICY.

And as the libel charged negligence, and the answer denied it, and averred that the stranding of the boat occurred under such circumstances as negatived the charge of negligence, and no proof being offered by either party on this point, or that there was any fraud or mistake in the settlement, *held*, the libelant could not recover on the claim that the loss was not covered by the policy.

In Admiralty.

*E. D. McCarthy*, for libelants.

*Hyland & Zabriskie*, for respondents.

BROWN, J. The libelants, at Buffalo, insured a cargo of wheat on board the canal-boat Worden, in tow of the Sidney, consigned to Armour, Plankinton & Co., of New York. One of the steam-flues of the Sidney having burst while she was coming down the Hudson river, she became unmanageable, and, as the answer states, drifted with the tide upon the rocks of Esopus island, whereby the cargo on board the Worden was lost. The cargo was abandoned to the libelants, who thereupon paid the consignees as for a total loss,—$9,211.75,—and, claiming to be subrogated to the rights of the consignees against the carrying vessels for the loss of the wheat, filed this libel to recover the sum of $6,175.89, the amount of the loss, after deducting the sum realized from the damaged cargo. The libel alleged that the stranding occurred through the negligence of the respondents, which the answer denies. On the question of negligence no evidence was given upon the trial. On that point both sides rested upon the pleadings, each claiming that the burden of proof was upon the other. Without reference to the question of negligence, however, inasmuch as the carrier had given a clean bill of lading binding himself to a delivery of the goods without exception or qualification, the libelants claimed that upon payment to the consignees they were subrogated to the benefit of the consignees' right of action for the loss of the goods against the carrier, as the principal debtor, for the non-delivery of the cargo; also that, upon the admissions of the answer, it was incumbent on the carrier to show that the stranding was without any fault on his

part, if that is material. The general principles of law invoked by the libelants are not denied, either as regards an insurer's right to subrogation, upon payment of a total loss, to the rights of the assured against any other persons primarily liable for such loss; or as regards the presumptions of negligence. The only question is as to the applicability of these principles to the facts of the case.

The contract of insurance, in this case, contains no express provision for any subrogation of the insurers to the rights of the assured on payment of the loss. In such cases, the right of subrogation, if any exists, being no part of the contract, does not depend upon the contract, or on the form of it; it is a mere equity to be worked out through the rights of the assured only, in his relation to other parties. If the assured has a legal right to indemnity for the loss against a carrier that has no legal or equitable right to the benefit of the insurance, then the liability of the carrier to the assured is regarded as the primary liability for the loss, and the liability of the insurer as secondary, and similar to that of a surety only. The insurer, on payment, is therefore held, in such cases, to be equitably entitled to stand in the shoes of the insured, and to recover such indemnity as the insured was entitled to recover against other persons having no right to the benefit of the insurance. *Mobile & M. Ry. Co.* v. *Jurey,* 111 U. S. 584; S. C. 4 Sup. Ct. Rep. 566; *Hall* v. *Railroad Cos.* 13 Wall. 367; *Garrison* v. *Memphis Ins. Cos.* 19 How. 312. In the case of *Hall* v. *Railroad Cos.,* supra, the court say:

"In respect to the ownership of the goods, and the risk incident thereto, the owner [the assured] and the insurer are considered but one person, having together the beneficial right to the indemnity due from the carrier for a breach of his contract, or for non-performance of his legal duty. Standing thus as the insurer does, practically, in the position of a surety, stipulating that the goods shall not be lost or injured in consequence of the peril insured against, whenever he has indemnified the owner [the assured] for the loss, he is entitled to all the means of indemnity which the satisfied owner [the assured] held against the party primarily liable. His right rests upon familiar principles of equity. It is the doctrine of subrogation, dependent not at all upon privity of contract, but worked out through the right of the creditor or owner [the assured.] Hence it has often been ruled that an insurer who has paid a loss may use the name of the *assured* in an action to obtain redress from the carrier whose failure of duty caused the loss."

As the right of the libelants to subrogation can only be claimed through the rights of the *assured,* the questions chiefly litigated were —*First,* who were insured under the policy in this case? and, *second,* was the owner of these vessels equitably entitled to the benefit of the insurance, so as to cut off any right of subrogation that the insurers might otherwise have had against him?

The facts are as follows:

The policy was issued in the name of Morse & Co., whose business is variously described as that of forwarders, carriers, transportation brokers, or, familiarly, scalpers. For convenience, I shall call them forwarders. They belong to a class of middle-men, long established in Buffalo, who handle all

the freight business there, as intermediaries between the boatmen and the owners of grain and produce, or their agents, who desire to ship it eastward. The forwarders see the consignors; agree upon the price of freight, which includes, insurance; procure boats to take the grain upon the terms fixed; get a certificate of insurance and deliver it to the shipper along with the bill of lading, which they sign as well as the captain; pay prior charges, if any; make any advances necessary to the boatmen for the trip; and receive, for their services, from the boatman, a commission, usually 5 per cent. upon the amount of stipulated freight. The insurance companies that engage in this kind of insurance have provided a particular form of policy specially prepared for it. The shipper designates the company in which the insurance shall be effected. The forwarder, at the beginning of each season, procures from the various companies what is termed an "open policy," which is attached to a "policy book," in which are entered the particulars of each insurance under it. To effect a particular insurance, the policy and the policy book are taken to the office of the companies' agents, who enter in the policy book the particulars of the insurance as applied for, and thereupon issue and deliver to the forwarder a certificate stating that insurance is effected, under the policy, upon cargo on board the vessel, of the value designated, and on account of the persons named; the loss, if any, payable to "the assured, or order, and return of this certificate." The certificate is thereupon indorsed in blank by the forwarder and delivered to the shipper, with the bill of lading, also signed by the forwarder, as above stated.

The transaction in this case was in accordance with the general custom above described. The grain in question was in charge of Mr. Meadows, as agent of the consignees in New York. Morse & Co. applied to him in negotiating for its transportation, and agreed upon the rate of five cents per bushel, including insurance, which the shipper directed to be taken in the libelants' company. Morse & Co. thereupon placed the transportation with Capt. Wager, the owner of the Sidney and the Worden, and the grain was loaded upon the latter. When the cargo was loaded, Morse & Co. obtained the captain's bill of lading, and, having previously procured a certificate of insurance, delivered it, indorsed by them in blank, to Mr. Meadows, along with the bill of lading, which Morse & Co. also signed, paying him at the time $200 for prior charges. The bill of lading recited Meadows as shipper on board the Worden, and provided for the delivery of the grain to the consignees in New York, without any exception or qualification, on payment of freight and prior charges, which were to be paid to Brooks & Co., the New York agents of Morse & Co.

The form of insurance was as follows: The "open policy" No. 772 states that the libelants, "by this policy, on account of Morse & Co., for whom it may concern, do *insure* the several persons whose names are hereinafter indorsed thereon as *owner*, *advancer*, or *common carrier*, on goods on his own boat, or boats belonging to others, from place to place, as indorsed hereon or in a book kept for that purpose, for the amounts, at the rate, and on the goods specified in said indorsement; no risk considered as insured until said *indorsement* is approved and signed." There are various provisions in reference to the lading and unlading, and the time allowed therefor. The risks assumed by the company are those of the seas, canals, rivers, and fire, and all other perils, losses, or misfortunes to the goods during said trip, "excepting perils, etc., from ice, jettison, theft, or from want of ordinary care and skill in lading or navigating said boats." There are numerous other provisions not material in this case. The certificate issued May 17th, on the application of Morse & Co., states that "Morse & Co. is insured under policy No. 772 in the sum of $9,875, in board, cargo of boat Wm. Worden, on wheat $9,875, at and from Buffalo to New York; loss, if any, payable to assured or order and return of this certificate."

The name of the consignees is not usually made known to the forwarder, and was not in this case known to him, until the grain was loaded. Upon the delivery of the bill of lading to the shipper, the name and direction of the consignee were written in the margin. When Morse & Co. obtained the certificate of insurance, they did not know who was to be the consignee. The agents of the insurers in Buffalo, who insured the certificate, and made the entry in the policy book, were fully acquainted with the established customs and usages in this business. They knew that Morse & Co. were forwarders, doing business in the manner above stated; they understood that the certificate of insurance applied for was designed to accompany a bill of lading of the goods in question; that Morse & Co. obtained the shipment of this cargo as agents of the captain; that they usually signed the bills of lading along with the captain; that they were accustomed to pay prior charges and to make advances to the captain; that the price of freight included insurance; and that Morse & Co were paid for their services by the carrier by a commission on the amount of freight.

1. Upon the facts above stated, it is manifest that the consignees and the carrier, as well as Morse & Co., had each of them an insurable interest in the cargo to its whole value. Any person responsible for goods in his custody has an insurable interest in them to the extent of his liability. 3 Kent, *262; Hutch. Carr. § 429; 2 Duer, Ins. 49; Arn. Ins. § 107; *Hooper* v. *Robinson,* 98 U. S. 528, 538; *Savage* v. *Corn Exchange, etc.,* 36 N. Y. 655; *Harvey* v. *Cherry,* 76 N. Y. 436; *Waring* v. *Insurance Co.* 45 N. Y. 606; per GRAY, J., *Eastern R. Co.* v. *Relief, etc.,* 98 Mass. 423; *Com.* v. *Hide & L. Co.* 112 Mass. 136, 141. The consignee had an insurable interest, because he was owner; the carrier, because as carrier he was answerable to the owner for the full value; Morse & Co., because by signing the bill of lading they were equally responsible to the consignee for the safe delivery of the cargo. As respects the consignee, indeed, both Morse & Co. and Capt. Wager, by signing the bill of lading jointly, made themselves jointly liable as carriers; although as between themselves, Morse & Co. were but agents in procuring freight and making advances on account of Capt. Wager as principal. To secure themselves, Morse & Co. took a separate bill of lading from the master, in which they were described as shippers; and the boat and cargo were consigned to Brooks & Co., New York, as agents of Morse & Co. As each of these three parties had an insurable interest to the full amount, it was competent for Morse & Co., in taking out the insurance under an open policy "for whom it might concern," to insure for the direct benefit of all three; and had the *certificate* of insurance, besides the words "Morse & Co.," contained the additional words "on account of whom it may concern," like the original policy, there can be no question that under the proofs in this case the policy would have inured directly to the benefit of all three, and all of them been "the assured;" for the evidence leaves no question that Morse & Co. intended this insurance to operate in some form for the benefit of all. The agents of the insurance company so understood it; Morse & Co., in effecting the insurance, did it by the direct request of the consignee's agent;

and they as clearly acted, and were understood to act, on account of the captain also. The insurance premium, though paid by Morse & Co., was charged as an advance against the captain and the freight, and was allowed as such by the captain before the loss; and the evidence was that they acted for the captain's benefit as well as for their own. It is well settled that a policy "for whom it may concern" in such a case inures to the benefit of all persons having an insurable interest that are intended to be benefited by it, whether known to the insurers or not, and that such persons may sue upon the policy in their own names. A recovery by one against the insurers, in such cases, inures to the benefit of all, and bars any subsequent action by the others. *Hooper* v. *Robinson*, 98 U. S. 528; *Aldrich* v. *Equitable Safety Ins. Co.* 1 Woodb. & M. 272; *Henshaw* v. *Mutual, etc.,* 2 Blatchf. 99; *Fabbri* v. *Phœnix Ins. Co.* 55 N. Y. 129, 133; *Walsh* v. *Washington, etc.,* 32 N. Y. 427, 439; 1 Arn. Ins. 169, note; *Waters* v. *Monarch Assur. Co.* 5 E. & Bl. 870, 871.

The certificate of insurance issued in this case does not contain the words "on account of whom it may concern," or any equivalent words, but the names of Morse & Co. only. The necessary construction of the original policy with its conditions, is that, in order to make any particular transaction available under it, the names of the individuals on whose account any particular insurance under it is effected, must appear by indorsement on the policy, or by an entry made in the policy book. This condition of the policy is a perfectly lawful one, and, being clearly expressed, is controlling. In this case the name of Morse & Co. alone is entered in the policy book, without any additional words, as "for whom it may concern;" nor are they described as agents. The certificate is in accordance with this entry, and is made payable to Morse & Co., or their order. There is no language in it that can be so extended as to include other persons. Upon the written contract, therefore, "the assured," in the language of the policy, are Morse & Co. only. In such a case parol evidence is not receivable to vary the written contract, or to enlarge the interests of the persons directly assured. Arn. Ins. 169, note; *Mead* v. *Mercantile, etc.,* 67 Barb. 519. The indorsement of the certificate by Morse & Co. to the consignees, who were the owners of the cargo, effectually secured the latter. The consignees, in receiving payment of the loss from the insurers, received it, not as "the assured" under the policy, but as the indorsees of Morse & Co., pursuant to the terms of the contract, which provided for payment "to order." This was the mode agreed on and accepted for the security of all. It was a legal and effectual mode. In paying the consignees, the insurers paid them on account of Morse & Co., who were "the assured," pursuant to the indorsement; and hence the rights, if any, to which the insurers were subrogated upon this payment, were the rights of Morse & Co., and not the rights of the consignees, independently considered, against Capt. Wager and his vessels. In legal effect, the transaction is the

same as respects the insurers' rights of subrogation as if they had paid the whole loss to Morse & Co. as the "assured," and the latter had then paid the owners in discharge of their liability to them.

2. The relation of Morse & Co. and Capt. Wager, as between themselves, was, as I have said, that of agent and principal. Morse & Co., by signing the bill of lading, had indeed made themselves liable as principals to the consignees; but, as between themselves, their liabilities were those of principal and surety. The insurance effected by Morse & Co. was, as I have said, clearly shown by the evidence to have been intended as much for the benefit of Capt. Wager as for themselves. It was effected upon his request and authority, and the premiums paid by Morse & Co. were charged against the captain and freight. Capt. Wager was absolutely liable to Morse & Co. for this advance of premium, whether the freight or insurance money should ever be collected or not. The fact that these premiums, as part of the freight, were a lien upon the cargo and would be repaid to the captain or to Morse & Co. upon the delivery of the cargo to the owners, in case there were no loss of the cargo, is therefore immaterial as respects Capt. Wager's interest in the policy. The insurance company sufficiently understood all this, since it was in the usual course of business as fully understood by them. But the insurance did not cover any negligence of the carrier, because such negligence was expressly excepted by the terms of the policy.

Under such circumstances there can be no question that Morse & Co., on recovering from the insurance company the whole amount of the loss, would hold the money for the discharge of the joint obligation of themselves and Capt. Wager to the consignee, and to that extent they would be regarded as trustees of Capt. Wager, as the principal obligor; and Capt. Wager, as principal, would have the right to compel that application of the insurance moneys. This would not in any way conflict with any of the terms of the policy, or of the certificate; and the relation of the parties, and the circumstances that gave Capt. Wager this right, could, therefore, be legally established by parol. The situation is, in substance, analogous to the situation of mortgagor and mortgagee, where the latter, at the request of the mortgagor, insures the mortgaged premises in his own name, and at the expense of the mortgagee, and the insurance is intended for the benefit of both. In such cases, it has been repeatedly held that the mortgagor is entitled to the benefit of the insurance, and to have the amount paid to the mortgagee by the insurers applied in reduction of the mortgage debt; and that the insurers, consequently, have no right of subrogation thereto. STORY, J., in *Carpenter* v. *Providence Ins. Co.* 16 Pet. 502–507; *Holbrook* v. *American Ins. Co.* 1 Curt. 193, 200; *Kernochan* v. *New York Bowery, etc.,* 17 N. Y. 428; *Waring* v. *Loder,* 53 N. Y. 581, 585; *Cromwell* v. *Brooklyn Fire Ins. Co.* 44 N. Y. 42, 47. But if the mortgagee insure his own interest, without any privity with the mortgagor, or if the insurance policy itself, in terms, provides for sub-

rogation to the mortgagee's rights upon payment of the loss, then the terms of the policy will prevail, and the mortgagor cannot have the benefit of the insurance, or compel the application of the payment to the reduction of his debt, and the insurers will be entitled to be subrogated to the mortgagee's rights against him. *Springfield, etc.*, v. *Allen*, 43 N. Y. 389; *Excelsior, etc.*, v. *Royal Ins. Co.* 55 N. Y. 343, 359; *Foster* v. *Van Reed*, 70 N. Y. 19; *Bank of S. C.* v. *Bicknell*, 1 Clif. 85, 91–93.

In this case there is no provision for subrogation in the insurance contract; hence any right of subrogation here, as previously stated, is a mere equitable right depending upon the actual relation of the other parties to each other. It is, therefore, subordinate to the equitable rights existing between a principal and his agent who effects the insurance for the benefit of both, and upon the account, and at the primary charge, of the principal.

It has been held that where the carrier expressly stipulates in the bill of lading that he shall have the benefit of any insurance effected upon the goods by the shipper, no subrogation against the carrier would arise in favor of the insurers upon their payment of a loss. *Carstairs* v. *Mechanics' & Traders' Ins. Co.* 18 FED. REP. 473; *Rintoul* v. *New York Cent. & H. R. R. Co.* 21 Blatchf. 439; S. C. 17 FED. REP. 905. If such a stipulation is upheld when inserted in the bill of lading, it must be equally valid when clearly proved to exist by extrinsic evidence.

This insurance having been obtained, in fact, for the benefit of Capt. Wager, as the principal carrier, and at his primary charge and request, as well as for the benefit of the agent, and also for the benefit of the consignees, through an indorsement of the certificate to them, and the insurers, in effect, knowing all the facts, Capt. Wager, as principal, has a superior equity to the application of the insurance moneys in discharge of his liability as carrier; and as this equity is incompatible with any subrogation to the rights of Morse & Co., as "the assured," against Capt. Wager or his vessel, no such subrogation can be allowed. The insurers' right being a mere equity to stand in place of Morse & Co., their right is subject to the same equities that affect Morse & Co. See *Kernochan* v. *Bowery*, 17 N. Y. 428; *Benjamin* v. *Saratoga Mut., etc.*, 17 N. Y. 415, 420; *Cromwell* v. *Brooklyn Fire Ins. Co.* 44 N. Y. 42, 47. As Capt. Wager, moreover, had the right to have the moneys paid by the insurers, whether it was paid to Morse & Co. or to their indorsees, applied in discharge of his, Capt. Wager's, obligation as carrier, the payment by the insurers operated in law as an extinguishment of Capt. Wager's liability; and hence no obligation of Capt. Wager to either Morse & Co., or to the owners, remained to which there could be any subrogation.

3. In what has been said above, reference has been had to a loss through causes covered by the policy. The policy, however, expressly excepts "want of ordinary care and skill in lading or *navigat-*

*ing* said boats." If the loss in this case happened through the negligence of Capt. Wager or the carrying vessels, or from the want of ordinary care, then the loss was not covered by the policy, and no one was entitled to recover upon it against the insurers. For the loss by such negligence the consignees could have held both Morse & Co. and Capt. Wager, under the bill of lading which both had signed; and Morse & Co., on paying the consignees, could have resorted to Capt. Wager and the carrying vessels for his indemnity, though he would have no valid claim upon the insurance company. If the case were one of doubt whether the loss happened by negligence or not, and the carrier were a stranger to the policy, having no equitable interest in the application of the insurance moneys, the insurers, instead of litigating their liability with the assured or their indorsees, might pay the owners of the cargo, as they did in this case, and take, as they did here, an abandonment of the goods, with an assignment of all claims for damages to themselves, and then prosecute the carriers for indemnity. *Excelsior, etc.,* v. *Royal Ins. Co.* 55 N. Y. 343, 352. It is not material to the carrier, according to the authorities, with whom he litigates the question of negligence; and the insurers, in settling and paying such doubtful claims, are not mere volunteers. *The Monticello,* 17 How. 152, 155; *Insurance Co.* v. *The C. D., Jr.,* 1 Woods, 72; *Sun Mutual Ins. Co.* v. *Mississippi Val. Transp. Co.* 17 FED. REP. 919.

But here the carrier, as I find upon the facts, is not a mere stranger to the insurance. He is equitably entitled to the benefits of the policy; and hence entitled by an equity paramount to that of the insurers, and as against Morse & Co., or their indorsees, to have any moneys paid on account of the loss to either of them applied in discharge of his own obligation. Any voluntary settlement made by the insurers with either, inures to his benefit as much as to theirs.

A voluntary settlement and payment are in general binding, and cannot be ripped up and set aside except upon some of the special and recognized legal grounds therefor; such as duress, fraud, or mistake of fact. 2 Greenl. Ev. §§ 85, 120–123; *Elliott* v. *Swartwout,* 10 Pet. 137, 154; *Nichols* v. *U. S.* 7 Wall, 128. This rule applies not only to the immediate parties to the settlement, but in favor of others also that are in privity with them. The carrier here, being equitably entitled to the benefits of the policy, is clearly in privity with Morse & Co., the assured, and their indorsees. A settlement by the insurers with either inures directly to the benefit of all. It is as binding as respects all, as respects either; and it cannot be set aside, as against either, except upon some of the special grounds above referred to. Upon either of these grounds it might be set aside, doubtless, in an action against the carrier; but then only upon appropriate averments in the libel, and upon appropriate proof. And in such a case the whole burden of proof is upon the libelants. "It is incumbent upon them," say the court in the analogous case of

*Hooper* v. *Robinson*, (98 U. S. 540,) "to establish everything necessary to entitle them to recover, and they have no right to throw upon the defendant any part of the burden that belonged to themselves." See, also, *Transportation Co.* v. *Downer*, 11 Wall. 129, 134.

If the proofs had shown, therefore, that this loss occurred by such negligence as rendered the insurers not liable upon their policy, and that the insurers had settled with and paid the owners upon a clear mistake of the facts in regard to their liability, I should hold that the libelants would be entitled to maintain an action against the carrier, under an appropriate libel for that purpose. But this is not a libel of that character. No mistake or misapprehension of any of the facts at the time of settlement and payment is alleged in the libel, or suggested in the proofs; and as to the alleged negligence, no evidence has been given by either party. The libel charges negligence; the answer denies it, and states that the stranding occurred under such circumstances as negative the charge. These averments of the answer must be taken as a whole. The libelants having once paid the loss, as a loss covered by the policy, if they sought to recover back the amount paid in an action against a carrier equitably entitled to the benefit of the policy, on the ground that the loss was within one of the exceptions of the policy, and was paid under a mistake of fact, must sustain the entire burden of proof, and affirmatively show both their ignorance and mistake as to the facts, and that the loss was actually within the exceptions of the policy.

The libelants are not in the situation of mere naked assignees of a cause of action for damages held by the consignees against the carrier; nor do they sue in that character. It has been said that insurance companies have no power to purchase and sue on such claims independent of any question of their own liability. *Excelsior* v. *Royal Ins. Co.* 55 N. Y. 343, 357. Here they sue as insurers, who have paid the loss as a loss covered by the policy; and they now claim subrogation, in consequence of such payment, to a claim against the carrier. If, for the reasons above stated, they might be allowed to reopen the settlement made upon a mistake of fact, and prove that the loss was one not really obligatory on them to pay, because caused by negligence, the action must be one appropriate to that purpose, and the burden of proof in all respects be sustained by them. Neither the form of action nor the proofs meet these requirements; and the libel must, in every point of view, therefore, be dismissed, with costs.